## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **NATHAN SANKPILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Cause No. 1:12-cv-224-WTL-MJD** |
| **STONE BELT ARC, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ENTRY ON MOTION FOR PARTIAL SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for partial summary judgment. Dkt. No. 68. The motion is fully briefed, and the Court, being duly advised, rules as follows.

### I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court accepts as true the admissible evidence presented by the non-moving party and draws all reasonable inferences in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

1

## II.   <u>BACKGROUND</u>

Plaintiff Nathan Sankpill began working for Defendant Stone Belt Arc, Inc. ("Stone Belt") in July 2007. Stone Belt is a service provider for individuals with developmental disabilities in Southern Indiana. As part of its services, Stone Belt offers supported living for its clients. Under the "Supported Living" program, clients may choose to live in their own home or apartment with Stone Belt staff providing care and support. Depending on the needs of the client, the services provided range from staff visits a few times per week to 24-hour staff support.

Sankpill was hired by Stone Belt as a program manager. Program managers are part of the Supported Living program and are responsible for the day-to-day operation of their assigned homes, including supervising the direct care staff within the home and completing the staff's payroll and timecards.

Three or four months after Sankpill started with Stone Belt, Sankpill became the program manager for a home in Columbus, Indiana, with two clients – Matthew Holland and Martin Bonowski. Holland and Bonowski could not speak, read, or write, and needed assistance with every aspect of their lives. Six to eight direct care staff worked in the men's home and reported to Sankpill. Sankpill and his staff aided Holland and Bonowski with all their daily living activities, including cooking, cleaning, and grocery shopping. They also took the men to their doctor's appointments, attended their food stamp hearings, and paid their bills and rent.

As program manager, it was Sankpill's responsibility to reconcile his clients' accounts each month and turn over the monthly ledger to Stone Belt's main office. After the month was over, the ledger and receipts for that month went to the main office. Sankpill would then undergo a quarterly review with the caseworker and his supervisors regarding whether each client's financial records were in order. A state auditor also went over all of the ledger and bank account

documentation at the main Stone Belt office and created an annual review report. No issue was ever raised with Sankpill's clients' financials at the time of these reviews.

Sankpill and two members of his staff, Lisa Goad and Bennett Pearl, were authorized to write checks on behalf of Holland and Bonowski. Holland and Bonowski also had debit cards related to their checking accounts. The checkbooks and debit cards were kept in the home in a binder and would only be taken off the premises if they were being used to make a purchase off-site. The binder also included Holland's and Bonowski's Social Security cards, identification cards, and food stamp cards.

Sankpill was also responsible for setting up his clients' utilities, including the phone and heat bills. At times, Sankpill and members of his staff would pick up items for their clients and/or their clients' home and pay for it with their own money. Sankpill would then reimburse himself or a member of his staff for the expense they paid for the client or the house. In making the reimbursement, Sankpill would enter the receipt and check number in the ledger with a notation to the side describing the purchase. Sankpill was not aware of any policy against reimbursing himself or staff members, nor was he aware of any policy regarding specific methods of reimbursement. Sometimes, reimbursement would be delayed until a client had the money necessary to make the reimbursement.

Some of the purchases Sankpill made for his clients were never reimbursed. In particular, Sankpill paid approximately $300 for the first few months of television and phone service for his clients' home and also bought a new mattress for Bonowski. Sankpill told his supervisors about the purchases he made for his clients that were never reimbursed, but he did not seek reimbursement from his clients because they did not have the money to repay him. With regard

to the mattress, Sankpill did not seek reimbursement from Stone Belt because it had already denied his request to purchase a mattress.

When Sankpill began working as program manager in Holland and Bonowski's home, he transferred Holland's checking account to Chase Bank. Sankpill testified that Chase had been running a promotion that gave his client $100 for opening an account with the bank. Sankpill also set up a checking account for Bonowski at Chase Bank to get the same promotion and because having his clients' accounts at the same place made things easier. Even though there were no Chase Bank branches in Columbus, Indiana, where Holland and Bonowski's home was located, Sankpill testified that it wasn't a problem because he and his staff only physically went to the bank once every three to four months because they had set up online banking. Sankpill also had a personal account with Chase Bank ending in -9191.

In August 2009, Sankpill obtained a second job. He was hired by Damar Services on a part-time basis as a direct care staff member. Damar is another service provider for individuals with developmental disabilities and it provides many of the same services as Stone Belt. As direct care staff for Damar, Sankpill provided care for individuals located in a "unit" on the Damar campus. Damar's clients live in a "community-type setting," described by Sankpill as comparable to a dormitory. Sankpill worked for Damar on Saturdays and Sundays and continued to work for Stone Belt as a full-time employee during the week.

Sometime in late 2009, Sankpill decided that he needed to take a leave of absence from Stone Belt to care for his mother, who has lupus. Sankpill's mother lives in Holts Summit, Missouri. After reviewing Stone Belt's leave policy, Sankpill contacted his direct supervisor, Lora Vanosdol, and told her that he needed to take a leave of absence because of his mother's illness. Sankpill informed Vanosdol that his plan was to stay in Missouri during the week and

care for his mother and then come back to Indiana on the weekends to work for Damar. Vanosdol did not discourage Sankpill from taking leave in any way during any of their conversations about his leave of absence. Sankpill also spoke with Vanosdol's immediate supervisor, Stella Mills, about taking a leave of absence. Mills did not discourage Sankpill from taking leave in any way during their conversation.

Following his conversations with Vanosdol and Mills, Sankpill contacted Stone Belt's Human Resources Department. After he completed the certification for leave under the Family and Medical Leave Act ("FMLA"), Sankpill was approved for FMLA leave by Michele Shepherd, Stone Belt's Organizational Effectiveness Coordinator. Sankpill's FMLA leave was approved from December 8, 2009, through March 6, 2010, the full twelve weeks of leave available under the FMLA. Shepherd did not discourage Sankpill from taking FMLA leave, nor did she question his need for leave. In fact, Shepherd sent Sankpill information on Stone Belt's personal leave program because, based on his leave documentation, Shepherd thought that Sankpill may have needed additional leave in excess of the twelve weeks provided by the FMLA. Sankpill testified that his plan was to return to work for Stone Belt after his FMLA leave ended and then terminate his employment with Damar so he could continue to take care of his mother on the weekends.

After Sankpill went on FMLA leave on December 8, 2009, he continued to work for Damar on the weekends and spent the weekdays in Missouri with his mother.

On January 21, 2010, while Sankpill was still on leave, Goad prepared a written statement about Holland's and Bonowski's finances. In the statement, Goad noted that she had been looking at the clients' bank statements and had noticed that there were transfers to a bank account number ending in -9191. Goad further stated that she had called Chase Bank to find out

5

whose account ended in -9191. Chase informed her that the account was a savings account, but would not tell her who it belonged to. When Goad asked if the account belonged to Sankpill, Chase verified that it did.

It is not the practice of Stone Belt to permit employees to make transfers into their personal bank accounts from a client's account.[1] Vanosdol therefore immediately reported Goad's findings to her supervisor, Mills. Vanosdol completed an Incident Report, writing that

> [d]uring a review of financial documentation we discovered potential misuse of consumers [sic] funds. Stone Belt will have their CPA do a thorough review of all financial documentation. Consumers will be reimbursed accordingly.

Stone Belt Incident Report, No. 70-22.

Stone Belt then launched an investigation into the potential misuse of Holland's and Bonowski's funds. Susan Russ, Stone Belt's East Region Director, headed the investigation. Stone Belt also submitted an initial incident report to the Bureau of Developmental Disabilities Services, a division of Indiana's Family and Social Services Administration, on January 22, 2010.

On further investigation, Russ discovered that several of Holland's and Bonowski's personal items were missing from their home. These items included debit cards, checkbooks, Social Security cards, identification cards, and birth certificates. Russ suspected that Sankpill had taken those items with him when he went on leave.

Russ also reviewed Holland's and Bonowski's online bank statements from December 2008 through December 2009. In doing so, Russ discovered what she considered "suspicious activity," including transfers to Sankpill's personal bank account and debit card purchases that

---

[1] Sankpill was not aware of any policy dictating methods of reimbursement that were or were not permitted. Furthermore, he argues in his statement of facts that there is no difference between a check and a bank transfer, Sankpill Resp. at 10, No. 81, but this is an improper place for argument.

were, in her opinion, "highly irregular" and outside of Stone Belt's service area. There were also several undocumented checks written from Holland's and Bonowski's accounts.

After making these further discoveries, Stone Belt closed Holland's and Bonowski's bank accounts. Russ also contacted the Columbus, Indiana, Police Department ("CPD") to report Stone Belt's suspicion that Sankpill had misappropriated client funds and taken their personal property. Russ spoke with Detective Mike Ward on January 27, 2010. Ward told Russ that they would investigate Stone Belt's report.

Additionally, Bradley Galin, Stone Belt's Senior Director of Human Resources, contacted Damar's Vice President of Human Resources, Liz Snyder, to inform her of the investigation by CPD. Galin believed it was his duty to inform Damar of the investigation in order to protect Damar's clients, who also have developmental disabilities and are vulnerable to being exploited by their care providers. Galin told Snyder that Stone Belt believed Sankpill may have misused client funds and that Stone Belt had contacted law enforcement. Galin did not intend to induce Damar to terminate Sankpill's employment, nor did he suggest that Damar should do so.

Based on Russ' initial investigation, Galin decided that Sankpill's employment with Stone Belt should be suspended pending the completion of the investigation. Galin sent Sankpill a letter dated January 27, 2010, informing Sankpill of his decision. In the letter, Galin specifically stated that Sankpill was "currently suspended due to an on-going investigation of possible misconduct involving the site you supervise in Columbus, Indiana." Letter, No. 70-13. Galin also demanded that Sankpill return all "Stone Belt and client materials and information that you have in your possession," *id.*, and informed Sankpill that Stone Belt had contacted state agencies, law enforcement personnel, and Damar to report its investigation. Galin further stated

7

that Sankpill was prohibited from contacting any Stone Belt client or employee other than Russ and Galin. Galin ended the letter with the telephone number where he could be reached.

On January 29, 2010, Stone Belt's CFO, Ward Brown, issued a report following his review of Holland's and Bonowski's bank accounts. As a result of the missing documents from the home, as well as other lost documentation due to a prior fire at Stone Belt's administrative office, Brown was able to review only online statements for Holland's and Bonowski's accounts.

According to Brown, the online account statements revealed four types of "suspicious activity," including: "1) Account transfers between [Holland's and Bonowski's] accounts and an account ending in 9191; 2) Electronic purchases (or debit card use) that was out of character, or removed from the service area of Stone Belt; (3) Checks with no documentation or readily available explanation; and (4) Over spending at Wal-Mart, Kmart, Marsh, Kroger, and Save-A-Lot." Ward Report at 1, No. 70-30. Brown stated that overspending at certain stores was suspicious because, while the residential expenses between Holland and Bonowski were supposed to be split equally, "[Bonowski] spent over the course of 14 months almost two times as much" at several stores as Holland. Thus, Brown concluded that "a portion of the purchases at these stores for [Bonowski] were fraudulent in some manner or another." Brown indicated that Stone Belt would reimburse Holland $2,519.98 and Bonowski $7,884.95 for what appeared to be inappropriate expenditures from their accounts.

The investigation revealed that the suspected misuse of client funds had been ongoing for many months, but went undetected because Vanosdol failed to perform the required monthly review of client financial activity and records, which review was a critical function of Vanosdol's responsibilities as Sankpill's supervisor. Accordingly, on January 29, 2010, Stone Belt issued a first written warning to Vanosdol. Vanosdol was removed from her position as

coordinator and demoted to program manager. Vanosol was also prohibited from working in Holland and Bonowski's home.

In early February 2010, Snyder called Sankpill and informed him that his employment with Damar was terminated effective immediately. Snyder told Sankpill that she had received a call from Galin and Galin had informed her of an investigation against Sankpill. Snyder did not tell Sankpill what specific allegations were being investigated.

Sankpill never received Galin's January 27, 2010, letter. Instead, a detective from CPD read the letter to him over the phone in February 2010, after the detective contacted Sankpill. Once he learned of the letter, Sankpill returned Stone Belt property and attempted to contact the Stone Belt HR department in Bloomington via voicemail and fax, and he called the number listed in Galin's letter, but he never received any return phone calls or correspondence.[2] Sankpill did not attempt to go to Stone Belt's offices in Bloomington, Indiana, or Columbus, Indiana, to speak with Russ or Galin because he believed that, by the terms of the letter, he was prohibited from going to any Stone Belt properties.  Neither Russ nor Galin ever received a telephone call or voicemail from Sankpill.

On March 1, 2010, Sankpill received an exit survey that is sent to former employees of Stone Belt after their employment has ended, either voluntarily or involuntarily. According to Stone Belt, Sankpill received these surveys by mistake; Galin does not know how or why it came to be that the survey was sent to Sankpill.

_____

[2] Stone Belt cites Sankpill's deposition and his personal phone records and work phone records for the assertion that Sankpill never contacted Galin or Russ. However, Sankpill contends that he did attempt to contact Stone Belt using the number provided in Galin's letter, and the Court resolves this dispute of fact in Sankpill's favor. Furthermore, Stone Belt does not clarify whether Sankpill's phone records indicate that he attempted to contact Stone Belt, albeit not through Galin or Russ.

Sankpill did not report to work on March 6, 2010, after his FMLA leave expired, because he believed that, per Galin's letter , the exit surveys, and Stone Belt's non-responsiveness, his employment with Stone Belt had already been terminated. According to Galin, Sankpill's employment was never in fact terminated; rather, as Galin had never received a response to his letter, he believed that Sankpill had voluntarily abandoned his employment. If Sankpill had returned from his FMLA leave, Stone Belt would have terminated Sankpill's employment because Galin honestly believed that Sankpill had misappropriated client funds.

In the months following Russ' initial contact with Detective Ward at CPD, Detective Ward interviewed several Stone Belt employees during his investigation into the allegations against Sankpill, including Goad, Vanosdol, Mills, and Russ. Eight months to one year into the investigation, however, Detective Ward contacted Russ and told her that the case was being turned over to the Marion County Prosecutor's office because most of the suspicious purchases were made in Marion County, Indiana. Russ followed up with Detective Ward after the case had been transferred to the Marion County Prosecutor's office because Stone Belt never heard from the Prosecutor's office. Detective Ward told Russ that the case likely was not "big" enough to be noticed by the Prosecutor in Marion County.

Sankpill testified during his deposition that he does not know what statements – if any – Stone Belt made to its staff and other Stone Belt coworkers about his employment with Stone Belt. In fact, no statements were made to Stone Belt's staff or other Sankpill coworkers about Sankpill's employment. Most, if not all, of the staff in Holland's and Bonowski's home were aware of Stone Belt's investigation against Sankpill, as it was a daytime staff member – Lisa Goad – who first discovered the potential misuse of client funds. Thus, it was not necessary to inform the staff of the investigation or make any statements regarding Sankpill's employment.

Sankpill does not know what statements – if any – Stone Belt made to potential employers of Sankpill about Sankpill's employment with Stone Belt. In fact, Galin is unaware of any contacts by potential employers of Sankpill for reference information. Additionally, Galin is unaware of any Stone Belt manager, supervisor, or employee providing any reference information – including any information regarding its suspicions of improper conduct by Sankpill – to any potential employer of Sankpill.

Finally, Sankpill does not know what statements – if any – Stone Belt made to the public about his employment with Stone Belt. In fact, Galin is aware of no statements by any Stone Belt manager, supervisor, or employee making any statements to the public about Sankpill's employment with Stone Belt.

On February 21, 2012, Sankpill filed the instant action, alleging claims against Stone Belt for (1) violating the FMLA by failing to reinstate him on his return from FMLA leave and terminating his employment; (2) failing to pay Sankpill his wages due and owing; (3) intentional interference with economic relationship; (4) defamation; and (5) blacklisting. Stone Belt now moves for summary judgment on all claims except claim 2.

### III.   EVIDENTIARY ISSUES

#### A.   Affidavits of Hurley and Dowery

In his response, Sankpill cites the affidavits of Douglas Hurley and Evelyn Dowery. Stone Belt contends that these affidavits should not be considered because Hurley and Dowery were not disclosed according to Federal Rule of Civil Procedure 26(a) and (e). In response, Sankpill contends that the affidavits are admissible as "rebuttal evidence."

Under Rule 26(a), a party must provide to the other party the name, address, and telephone number of each individual likely to have discoverable information that the disclosing

11

party may use to support its claims or defense, "unless the use would be solely for impeachment." Subsection (e) of that rule imposes a duty to supplement or correct those disclosures if they subsequently become incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other party during discovery. The remedy for failure to identify a witness required by Rule 26(a) or (e) is the exclusion of that witness. Fed. R. Civ. P. 37(c). The sanction of exclusion is automatic and mandatory unless the offending party can show that the violation was either substantially justified or is harmless. Fed. R. Civ. P. 37(c); *e.g.*, *Ciomber v, Cooperative Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008).

According to Stone Belt, Sankpill never disclosed Hurley or Dowery as witnesses, and Sankpill does not dispute this fact. The exclusion of these witnesses is thus automatic and mandatory unless Sankpill can show that the violation was either substantially justified or is harmless. Sankpill does neither; rather, he asserts that these witnesses' testimony is admissible as rebuttal evidence. Regardless of whether their testimony is rebuttal evidence, Sankpill has not articulated any reason why that fact negates the mandatory and automatic effect of the exclusionary rule.  These witnesses are therefore excluded from supplying evidence on this motion under Rule 37(c).

### B.    Affidavit of Hodnett

In support of his defamation claim, Sankpill also cites the affidavit of Rachel Hodnett regarding a conversation about Sankpill she had in summer of 2011 with one Mary Brown. Although Hodnett indicates in her affidavit that she believed Brown was working for Stone Belt at the time, the undisputed actual evidence of record is that Brown worked for Stone Belt from April 2007 to November 2007 and was not an employee of Stone Belt in summer 2011. As

Brown was not an employee of Stone Belt, what she said to Hodnett about Sankpill cannot be a source of liability for Stone Belt.[3] The Court therefore excludes Hodnett's affidavit as irrelevant.

## C.  Sankpill's Testimony Regarding What Snyder was Told

Sankpill also cites his own deposition testimony regarding what Galin told Snyder when he called her. According to Sankpill, Snyder later told Sankpill that "Galin had been explicit to her about the allegations," and "there was proof beyond a reasonable doubt." Sankpill's Resp. at ¶¶ (D)(6)-(7), No. 81. Stone Belt argues that these statements are inadmissible hearsay.

Hearsay is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Civ. P. 801(c). Here, Snyder's recap of the conversation for Sankpill is the out of court statement, and it is being used as evidence of what Galin said when he talked to Snyder. It is thus hearsay; even Sankpill does not dispute that it is.

Hearsay is not admissible unless provided otherwise in, among other sources, the Federal Rules of Evidence. Fed. R. Evid. 802. Sankpill offers two reasons why these hearsay statements are admissible. First, the statements are "rebuttal evidence." Second, these statements are admissible under Federal Rule of Evidence 807. On his first point, Sankpill fails to identify any legal precedent for a "rebuttal evidence" exception to the hearsay rule. With regard to his second point, Sankpill argues that the five elements of the residual exception are met:

> It is trustworthy because Ms. Snyder would have no reason to lie to Mr. Sankpill about what Mr. Galin told her at that point in time.[4] It is material since it is an important element of Mr. Sankpill's intentional interference and defamation claims. It is of high probative value since it [is] the only evidence available to Mr. Sankpill to refute what was said in a conversation between Mr. Galin, a manager of Stone Belt, and Ms. Snyder, a longtime friend or associate of Mr. Galin.

---

[3] There is no evidence regarding who told Brown what she said to Hodnett and the Court expresses no opinion on whether such evidence would be admissible.

[4] Given that Snyder thereafter terminated Sankpill's employment with Damar, it is not clear that she had no incentive to cast Galin's statements in the most accusatory light.

> Without this evidence, these two people could make up anything they want about this conversation. The interests of justice also weigh in favor of admitting this evidence. A jury should be given the opportunity to decide who is telling the truth about this conversation. Finally, Stone Belt has been on notice of this evidence since they began discover [sic].

Sankpill Surreply at 3-4, No. 99. However, the residual exception is construed narrowly, *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 631 (7th Cir. 2006), and the Court finds nothing in Sankpill's argument to bring these classic hearsay statements within the narrow realm of the residual exception. Nor has Sankpill cited any precedent for admitting similar statements. Moreover, it is Snyder's memory and perception that would be most important to the jury here and Sankpill's testimony does not permit inquiry into Snyder's memory. Accordingly, Sankpill's statements are excluded from the above statement of facts.

### IV.   DISCUSSION

#### A.   FMLA

In his Complaint, Sankpill alleges that Stone Belt violated the FMLA when it (1) failed to reinstate him to his former position when he returned from FMLA leave; and (2) retaliated against him for taking FMLA leave by terminating his employment. The Court addresses each claim below.

##### 1.   Failure to Reinstate

It is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). "When an employee alleges that his employer interfered with his substantive rights under the FMLA, he must establish that (1) he was eligible for the FMLA's protections; (2) his employer was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was

entitled." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 636-37 (7th Cir. 2009). Stone Belt contends that Sankpill's claim fails on the fifth prong.

Sankpill argues that a question of material fact exists because it is not clear whether, and if so when, Stone Belt terminated Sankpill's employment. Taking the facts in the light most favorable to Sankpill, the Court will assume for the purposes of this motion that, reading between the lines, Galin's January 27, 2010, letter effectively terminated Sankpill's employment. Sankpill has thus shown that his FMLA rights to twelve weeks of job-protected leave and reinstatement were denied.

However, that does not end the inquiry. Although FMLA interference claims, unlike retaliation claims, do not require "discriminatory or retaliatory animus," *Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 885 (7th Cir. 2005), both kinds of claims require that the employee be *entitled* to reinstatement. *Cracco*, 559 F.3d at 636; *see also Kauffman*, 426 F.3d at 885-87 (assessing whether employee's leave certification was timely and adequate).[5]

An employee who takes leave under the FMLA is entitled to be restored to his former position once his leave expires. *See generally* 29 U.S.C. § 2614. However, the right to reinstatement is not unlimited. An employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position of employment to which the employee would have been entitled . . . had the employee not taken leave." 29 U.S.C. § 2614(a)(3)(B).  In other words, "[a]n employee has no greater right to reinstatement . . . than if the employee had

---

[5] "When an employee alleges a deprivation of the substantive guarantees of the FMLA, the employee must establish, by a preponderance of the evidence, an entitlement to the disputed leave." *Darst v. Interst. Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008). The Court takes its cue from the parties, who jump over Sankpill's initial burden to designate some evidence on this point and focus instead on Stone Belt's assertion that Sankpill was not entitled to leave. *See Simpson v. Office of Chief Judge of Cir. Court of Will Cnty.*, 559 F.3d 706, 715 (7th Cir. 2009) ("Although proof of pretext is not necessarily sufficient, by itself, to support an FMLA interference claim, it can have some evidentiary value.").

been continuously employed during the FMLA period." 29 C.F.R. § 825.216(a). Thus, "because

the FMLA only entitles employees to the same position that they would have otherwise been

entitled . . . , an employer may terminate employees – even when on leave – if the employer

discovers misconduct that would justify termination had leave not been taken." *Daugherty v.*

*Wabash Ctr., Inc.*, 577 F.3d 747, 750 (7th Cir. 2009). "The fact that the leave permitted the

employer to discover the problems cannot logically be a bar to the employer's ability to fire the

deficient employee." *Id.* (citing *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 706 (7th Cir.

2001). However, the employer must have an honest suspicion of the misconduct warranting

termination. *Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997) ("If

Navistar had to prove more than an honest suspicion simply because Kariotis was on leave, she

would be better off (and enjoy 'greater rights') than similarly situated employees (suspected of

fraud) who are not on leave. The statute and regulations rule out that inequity."); *see also*

*Scruggs v. Carrier Corp.*, 688 F.3d 821, 825-26 (7th Cir. 2012) (discussing the requirement of

"honest suspicion" with regard to whether employee was misusing FMLA leave).

     "The employer therefore may present evidence to show that the employee would not have

been entitled to his position even if he had not taken leave; the employee then must overcome the

employer's assertion." *Cracco*, 559 F.3d at 636; *see also* 29 C.F.R. § 825.216(a)(2) (imposing

burden on employer to show employee would have been laid off during FMLA leave period);

*Pagel v. TIN, Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) ("To survive summary judgment,

[employee] must overcome any such evidence offered by [employer]."); *Daugherty*, 577 F.3d at

750 ("Daugherty makes no attempt to refute . . . numerous serious deficiencies in Daugherty's

performance."); *Ogborn v. United Food & Comm. Workers Union, Local No. 881*, 305 F.3d 763,

769 (7th Cir. 2002) (granting summary judgment because evidence cited by employee did

"nothing to negate the evidence that [employer] discovered additional examples of his poor performance").

Stone Belt contends that Sankpill would not otherwise have been entitled to reinstatement because it suspected him of misusing client funds. According to Bradley Galin, Stone Belt's Senior Director of Human Resources, Galin "honestly believed that Sankpill had misappropriated client funds," and therefore Stone Belt would have discharged Sankpill had he returned to work after his FMLA leave. Such evidence is sufficient to support a jury finding that Stone Belt had an honest suspicion that Sankpill had misused client funds.

Sankpill may nevertheless withstand summary judgment if he points to evidence from which a reasonable jury could conclude that Stone Belt did not, in fact, have that honest suspicion. Sankpill contends that there is sufficient evidence from which "a jury could find [Stone Belt's] alleged suspicion a lie and a pretext for failing to reinstate Mr. Sankpill." Sankpill Resp. at 16, No. 81. In support, Sankpill makes three points: (1) Stone Belt failed to conduct a full and thorough review of Holland's and Bonowski's bank accounts; (2) Stone Belt was aware that staff members were reimbursing themselves; and (3) the disparity in purchases between Holland and Bonowski is easily explained. The Court addresses each point in turn.

Sankpill first points to CFO Ward's review of Holland's and Bonowski's online bank account statements. According to Sankpill,

> [t]hese bank records give little or no detail regarding what the money was spent on; rather, these records simply establish the "flow" of the clients' money. The information that Stone Belt needed to review in order to understand how these clients' money was spent was kept in detail in the monthly ledger with receipts for purchases. *See* (Sankpill Dep. pp. 41-42, 44-45, 217, 220). Stone Belt knew that these records existed and yet, a jury could easily find that Stone Belt intentionally did not review them. Stone Belt concocted an issue by refusing to review the monthly ledger, quarterly and annual reports stating that all of the clients' financial [sic] were in order.

Sankpill Resp. at 16, No. 81. The Court disagrees. The undisputed evidence is that the current month's ledger was missing and prior financial documentation had been destroyed in a fire. In light of these facts, no jury could "easily find" that Stone Belt "intentionally" did not review additional documentation.[6]

Second, Sankpill contends a jury could find that Stone Belt's knowledge of its employees' reimbursement practices renders its sudden suspicion unbelievable at the outset.

> Moreover, Stone Belt was aware that staff members such as Mr. Sankpill were reimbursing themselves and are now claiming that doing so by bank transfer was prohibited - another lie. No such policy existed which means that the alleged impetus of the investigation is bogus. *See* (Sankpill Aff. ¶5). This is precisely what a jury could find based upon the evidence.

*Id.* at 16, No. 81. Sankpill bases his third point on a similar idea:

> Likewise, the disparity in purchases between the clients is easily explained. Martin received more money than Matt did by nearly twice. So a lot of time, Martin would end up paying more for things in order for the bills to get paid and items purchased. *See* (Sankpill Dep. pp. 116-117). Laura Vanosdol and Stella Mills were aware that more of Martin's money was being used to pay bills and purchase items because Matt did not have enough money to split all of the bills evenly. *See* (Sankpill Aff. ¶10). Stone Belt could not discover a disparity that it already knew existed.

*Id.* at 16-17, No. 81. As Stone Belt points out, however, in both cases Sankpill fails to articulate the source of his knowledge of Stone Belt's, Vanosdol's, and Mills' awareness. Absent such an explanation, the Court is unable to find that Sankpill has the requisite personal knowledge to testify on this matter. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). There is thus no admissible evidence supporting Sankpill's contention that Stone Belt,

---

[6] Furthermore, even if there were evidence that Stone Belt's investigation was less than thorough, that fact would not necessarily undermine the honesty of Stone Belt's suspicion. *See Scruggs*, 688 F.3d at 826 ("Although Carrier could have conducted a more thorough investigation, as Scruggs fervently argues, it was not required to do so.").

Vanosdol, and Mills were aware of reimbursement practices or unequal allocation of household expenses.

Two additional points are worthy of note. Sankpill clearly has personal knowledge of his own awareness (or lack thereof) of a policy against reimbursement generally or against certain reimbursement methods. However, Sankpill's lack of awareness of a policy does not shed much light on whether a policy existed, and in no way impacts the legitimacy of Stone Belt's suspicion. Likewise, it may be that an inequitable split of household expenses between Holland and Bonowski on account of their disparate incomes enabled each man to meet his needs more efficiently, but this fact has no bearing on whether Stone Belt should have been (or was) suspicious of the disparity on paper.

Stone Belt has produced sufficient evidence of its honest suspicion of Sankpill, but Sankpill has not designated any evidence from which a reasonable jury could find that Stone Belt "was simply attempting to manufacture a reason to terminate Mr. Sankpill." Sankpill Resp. at 17, No. 81. Stone Belt is therefore entitled to summary judgment on this claim.

### 2. *Retaliation*

It is also unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). "As with other employment discrimination statutes, a claim for retaliation under the FMLA can proceed through the direct or indirect methods of proof." *Daugherty*, 577 F.3d at 751.

"A plaintiff prevails under the direct method by showing an admission of discrimination or by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.* Under the indirect method, a plaintiff creates a presumption of discrimination by demonstrating that "(1) he engaged in statutorily

19

protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Cracco*, 559 F.3d at 633.

Neither party disputes that Sankpill engaged in statutorily protected activity – taking FMLA leave. Furthermore, for the purposes of this motion, the Court will assume that Stone Belt effectively terminated Sankpill on January 27, 2010, by way of Galin's letter. The question, then, is whether Sankpill has designated evidence sufficient to create an inference that he was discharged on account of his FMLA leave.

Sankpill contends that there is direct and indirect evidence supporting his retaliation claim:

> First, proximity, Mr. Sankpill was terminated the day after he was to report back to work. Secondly, the failure of Stone Belt to return Mr. Sankpill's phone calls so that his return to work could be worked out. Third, Stone Belt's vain attempts to portray Mr. Sankpill as a thief while ignoring the quarterly and annual reports establishing that his clients' finances were in order and failing to review the one source of information, the monthly ledgers, which would detail each purchase and reimbursement. Finally, there is the March 1, 2010 exit survey which a jury could decide is evidence that Stone Belt had made the determination to terminate Mr. Sankpill before his FMLA leave was over. This circumstantial evidence is sufficient for a jury to infer that Stone Belt has discriminatory intent when it chose to ignore and then fire Mr. Sankpill upon his attempt to return to work from FMLA leave. *See Johnson*, 2010 U.S. Dist. LEXIS 86753 *24 (citing *Argyropoulos v. City of Alton,* 539 F.3d 724, 733-34 (7th Cir. 2008).

Sankpill Resp. at 17. As an initial matter, the Court notes that Sankpill does not articulate any argument regarding the second and third factors of a prima facie case under the indirect method.[7] The Court thus analyzes Sankpill's argument under the direct method.

---

[7] Sankpill raised his prior work performance as the source of his retaliation claim at his deposition, but counsel did not raise that argument here. However, even if counsel had made this argument, he nevertheless fails to address the fourth prong, similarly situated comparators.

On the whole, the evidence designated by Sankpill fails to create a "convincing mosaic" of retaliatory intent on the part of Stone Belt. Sankpill attempts to highlight temporal proximity, but even he can't decide what termination theory serves him best. Regarding his interference claim, Sankpill contended that Stone Belt's January 27, 2010, letter was an effective termination, but he now argues, without evidentiary support, that Stone Belt terminated him *the day after* he was set to return from leave, while at the same time arguing that the decision to terminate his employment was made when the exit surveys were sent. Regardless, even assuming that Sankpill has shown proximity, which can create an inference of discriminatory motive, "temporal proximity is not sufficient to withstand summary judgment," *Daugherty*, 577 F.3d at 751, and Sankpill's other "evidence" on this point fails to support his claim. The fact that Stone Belt did not return Sankpill's calls implicates his FMLA leave only because Stone Belt failed to return his calls while Sankpill was on leave. It is therefore at most additional temporal proximity evidence. Sankpill again attempts to undermine Stone Belt's asserted reason for terminating him – its suspicion that he misappropriated client funds – but the "evidence" he cites fails to impugn Stone Belt's assertion. As described above, the undisputed evidence is that the documents Sankpill contends Stone Belt should have considered do not exist. Even if they did, that fact does not necessarily undermine the honesty of Stone Belt's suspicion. Left with only the weakest of proximity evidence, Sankpill has failed to create a convincing mosaic from which a jury could infer that Stone Belt terminated Sankpill because he took FMLA leave. Summary judgment on this claim is therefore warranted.

## B.        Tortious Interference with Economic Relationship

In count III, Sankpill contends that Stone Belt "intentionally interfered" with his relationship with Damar "with the goal of having [Sankpill] terminated by Damar." Compl. at ¶¶ 39-40.

To establish a claim of tortious interference with a contractual relationship,[8] a plaintiff must show (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducements of breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach. *E.g.*, *Fulp v. Gilliland*, 972 N.E.2d 955, 965 (Ind. Ct. App. 2012). Stone Belt argues that Sankpill has no evidence from which a jury could find for him on the third and fourth prongs.

In support of the third prong, Sankpill cites only his own testimony of what Snyder told him that Galin told Snyder. The Court has already held that this testimony is inadmissible hearsay, and there is thus no question of material fact regarding what Galin said. Sankpill is left only with argument , asking "[w]hat other intent did Mr. Galin have then [sic] to induce Damar to fire Mr. Sankpill by calling the head of human resources, Ms. Snyder?" Sankpill Resp. at 18, No. 81. Arguments are not evidence, and Sankpill has failed to designate any evidence that Galin (and Stone Belt) intentionally induced Damar's breach of contract.[9]

Likewise, Sankpill has pointed to no evidence on the fourth prong. He asserts that

---

[8] Although Stone Belt expresses some uncertainty about whether Sankpill's claim is in the nature of intentional interference with a contractual relationship or a business relationship, Sankpill's response clarifies that he proceeds under the former.

[9] In fact, although not considered by the Court, the undisputed evidence is to the contrary: Galin contacted Snyder out of concern for the financial security of Damar's clients.

> a jury could find (1) Mr. Galin's conduct defamatory *per se*; (2) his motive was to harm Mr. Sankpill; (3) that his job at Damar was important to Mr. Sankpill; (4) that there is no duty to report this type of accusation; (5) that society does not want defamatory *per se* statements made; (6) that Mr. Galin's comments led directly to Mr. Sankpill being fired; and (7) this type of conduct was completely out-of-bounds for an alleged "current" employer."

Sankpill Resp. at 18-19, No. 81. Sankpill's argument is initially problematic, as these points include issues of law (whether a duty exists), policy conclusions already decided by the legislature (whether society "wants" defamatory *per se* statements made), and factors irrelevant to whether Stone Belt was justified (whether Galin made defamatory statements; whether Galin caused Damar to fire Galin; whether the Damar job was important to Sankpill). Of those statements that are relevant to the justification inquiry – whether Galin's motive was to harm Sankpill and whether Stone Belt's conduct was "out-of-bounds"– Sankpill has not designated evidence from which a jury could find in his favor.

One additional argument bears mention. Sankpill contends that no legal duty to report these accusations existed. Even assuming for the purposes of this motion that there is no such duty, Sankpill's view of the justification prong is too narrow. The following factors are relevant in determining whether an intentional interference is justified: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties." *Fulp*, 972 N.E.2d at 965. Whether a legal duty exists may shed light on the "social interest" prong, but the absence of a legal duty is not *ipso facto* the absence of justification.

Sankpill has failed to designate sufficient evidence to support a jury finding on prongs three and four, and Stone Belt is therefore entitled to summary judgment on this claim.

### C.     Defamation

In his Complaint, Sankpill contends that Stone Belt "published false information regarding [Sankpill] to co-workers, Damar, potential employers of [Sankpill] and the public." Compl. at ¶ 43, No. 1. Stone Belt contends that it is entitled to judgment on this claim for two reasons: (1) Sankpill failed to set out the allegedly defamatory statements in his Complaint; and (2) the statements made by Galin were not false.

"To establish a claim of defamation, a plaintiff must prove the existence of a communication with defamatory imputation, malice, publication, and damages." *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006) (internal citations omitted). "Any statement actionable for defamation must not only be defamatory in nature, but false." *Id.*

Regardless of whether Sankpill properly pleaded his defamation claim, no reasonable jury could find in favor of Sankpill on the evidence of record. There is no evidence that anyone at Stone Belt ever communicated with its coworkers, Sankpill's potential employers, or the public about Sankpill; there is thus an absence of evidence on two critical elements of Sankpill's claim – a defamatory statement and publication. As for Galin's communications with Snyder, there is evidence that Galin told Snyder that Stone Belt believed Sankpill may have misused client funds and that Stone Belt had contacted law enforcement. However, Sankpill has not designated any evidence from which a reasonable jury could find that these statements are false – that is, he has not pointed to any evidence that Stone Belt *did not believe*[10] that Sankpill may

---

[10] This language is critical. There is no evidence that Stone Belt flatly stated that Sankpill *had* misused client funds; Galin said that Stone Belt *believed* Sankpill had misused client funds.

have misused client funds or that it *had not* contacted law enforcement. Stone Belt is therefore entitled to summary judgment on this claim.

### D.     Blacklisting

Stone Belt contends that it is entitled to summary judgment on Sankpill's blacklisting claim because there is no evidence that Stone Belt ever had any contact with any of Sankpill's potential employers. Sankpill utterly fails to respond to Stone Belt's contention; nevertheless, the Court may only grant summary judgment "if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it," Fed. R. Civ. P. 56(e)(3), and the Court must therefore independently determine whether Stone Belt is entitled to it.

A cause of action for blacklisting under Indiana law requires showing that an employer prevented a former employee from obtaining employment with any other person or company. Ind. Code § 22-5-3-2; *see also Loparex LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 810-11 (Ind. 2012). Here, as Stone Belt contends, there is absolutely no evidence that Stone Belt in any way attempted to prevent Sankpill from finding subsequent employment. Accordingly, summary judgment on this claim in favor of Stone Belt must be granted.

### V.     <u>CONCLUSION</u>

For the foregoing reasons, Stone Belt's motion for partial summary judgment is **GRANTED** as to claims 1, 3, 4, and 5.

The Court's jurisdiction over Sankpill's state law claims is based on 28 U.S.C. § 1367, which provides for the exercise of supplemental jurisdiction over claims based on state law that are closely related to the federal claims in a case. However, "[w]hen the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over

---

Thus, the question is not whether Sankpill *did* misuse client funds, but whether Stone Belt *believed* that he had.

any supplemental claim to the state courts." *Leister v. Dovetail, Inc.,* 546 F.3d 875, 882 (7th Cir. 2008). There are exceptions to that general rule, and the court should decide the merits of a supplemental state claim when (1) the statute of limitations has run, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is "absolutely clear" how the state claims should be decided. *Davis v. Cook Cty.,* 534 F.3d 650, 654 (7th Cir. 2008). Here, the dearth of designated evidence on the elements of claims 3, 4, and 5, put them squarely within the third exception. However, there is no similar applicable exception to claim 2. Accordingly, claim 2 is **DISMISSED WITHOUT PREJUDICE**. *See also Groce v. Eli Lilly Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is well-establish law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

SO ORDERED:     06/11/2013

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

26